UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BARBARA PALMER,

                Plaintiff,                              Case No. 10-cv-14500

                                                  Paul D. Borman
                                                  United States District Judge

v.

SHARON ADAMS, in her individual
capacity and as a Children's Protective
Services employee of the Department of
Human Services, DEVIN C. SMITH, in
his individual capacity and as an employee
of the Department of Human Services,
ELLEN STEPHEN, in her individual
capacity and as an employee of the
Children's Center Staff,

                Defendants.

_____/

OPINION AND ORDER
(1) GRANTING DEFENDANT SHARON ADAMS'S
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 21) AND
(2) DENYING PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT (DKT. NO. 23)

       This matter comes before the Court on Defendant Sharon Adams's Motion for Summary

Judgment (Dkt. No. 21) and Plaintiff's Cross-Motion for Summary Judgment (Dkt. No. 23). The

parties filed responses (Dkt. Nos. 28, 27) and replies (Dkt. Nos. 29, 30.) The Court held a hearing

on May 21, 2012. For the reasons that follow, the Court GRANTS Defendant's motion for summary

judgment and DENIES Plaintiff's cross-motion for summary judgment.

**INTRODUCTION**

In this 42 U.S.C. § 1983 action, Plaintiff Barbara Palmer challenges the actions of Defendant Sharon Adams, an employee of the Child Protective Services Division of the Department of Human Services of Michigan.[1]  Plaintiff is the maternal grandmother and was the legal guardian of the minor child, Kaniyah Palmer.  Kaniyah lived with Plaintiff from the time of her birth on July 2, 2002 until she was removed from the home by court order on August 9, 2007.  In May, 2007, Defendant Adams was assigned to investigate allegations that Plaintiff's granddaughter, Kaniyah, had been sexually abused in Plaintiff's home by Corey Palmer, who is Plaintiff's son and Kaniyah's uncle.  As a result of her investigation, which Adams concluded substantiated the allegations of abuse, Defendant Adams petitioned the Wayne County Circuit Court - Family Division, and received an Order, for Kaniyah's removal from Plaintiff's home.  On August 9, 2007, Kaniyah was removed from Plaintiff's home by police officers pursuant to the court order and ultimately placed into foster care.

Plaintiff alleges that Adams conducted a "faulty and erroneous" investigation, resulting in an unconstitutional interference with Plaintiff's rights of familial association.  Plaintiff claims that Adams's "faulty and erroneous" investigation also amounted to gross negligence under Michigan law.  Plaintiff also claims that Defendant deprived her of due process by improperly requesting that Plaintiff's name be placed on the Michigan Central Registry and failing to remove Plaintiff's name from the Central Registry when requested.  Plaintiff seeks money damages.  For the reasons that follow, the Court GRANTS Defendant's Motion for Summary Judgment and DENIES Plaintiff's

---

[1] Plaintiff has conceded that she has no viable legal claim against Defendants Devin Smith and Ellen Stephen, who were dismissed by Order of the Court on May 2, 2012. (Dkt. No. 8, Order Dismissing Defendants Smith and Stephen.)  Plaintiff has also conceded that she has no viable conspiracy claim and has agreed to the dismissal of Count IV of her Complaint.  (Dkt. No. 23, Plaintiff's Cross Motion for Summary Judgment 24.)

2

Cross Motion for Summary Judgment.

## I.      BACKGROUND

On May 25, 2007, Child Protective Services of the State of Michigan Department of Human Services received an anonymous complaint alleging that Kaniyah Palmer, then a five-year old girl, was being sexually abused by her uncle, Corey Palmer.  Based upon this allegation, the Department of Human Services ("DHS") assigned Defendant Sharon Adams to  investigate the allegations. (Pl.'s Cross Mot. Summ. Judg. Ex. 1, Deposition of Sharon Adams, November 1, 2011 4:16-5:9; 15:15-25; Def.'s Mot. Summ. Judg. Ex. 1, Investigation Summary.)  Kaniyah has lived since her birth on July 2, 2002, with her maternal grandmother, the Plaintiff, Barbara Palmer.  (Pl.'s Cross Mot. 4.)  Plaintiff was appointed Kaniyah's legal guardian by the Wayne County Probate Court shortly after Kaniyah's birth.  (Compl. ¶ 8; Def.'s Mot. Ex. 13, Deposition of Barbara Palmer, October 12, 2011, 39:2-40:6.)  Kaniyah's mother, Diamond Palmer, who was 15 when Kaniyah was born, suffers from depression, is suspected to be a drug abuser and has had little involvement in Kaniyah's care since her birth, which was complicated by breech conditions.  (Def.'s Mot. Ex. 3, Oct. 25, 2007 Transcript of Permanent Custody Trial & Disposition, Wayne County Circuit Court, Family Division, Judge Leslie Kim Smith 3-10 (hereinafter "Tr. Custody Hrg. at _"); Def.'s Mot. Ex. 1, Investigation Summary 3; Palmer Dep. 34:2-16, 37:23-39:1.)  Kaniyah's biological father, Anthony Morris, who was 45 years old when Kaniyah was born, has never been involved in Kaniyah's care and is presently incarcerated.  (Tr. Custody Hrg. at 10-11; Investigation Summary 3; Palmer Dep. 34:19-35-2, 41:1-13.)

Upon being assigned Kaniyah's case, Defendant Adams began attempts to contact Plaintiff to investigate the allegations regarding Kaniyah.  Adams finally achieved contact with Plaintiff by

phone on June 1, 2007. (Investigation Summary 2.) Plaintiff explained to Adams that she had guardianship over her granddaughter and that Kaniyah's mother, Diamond Palmer, wanted nothing to do with raising Kaniyah and in fact tried to kill Kaniyah when she was born. *Id*. Plaintiff later denied that her daughter had ever tried to harm Kaniyah. (Palmer Dep. 41:14-16.) Plaintiff also explained to Adams that Kaniyah's biological father was in prison on drug charges. (Investigation Summary 4.) Plaintiff denied that her son Corey lived in the home with her but stated that another daughter, Omega Palmer, was living in the home to help out because of Plaintiff's problems with high blood pressure and diabetes. Plaintiff also stated that she suffered from depression and speech problems and had been prescribed Prozac four years ago. *Id*. Adams scheduled a home assessment for the following day.

Following her call to Plaintiff, Adams placed a call to Kaniyah's Aunt, JoAnne Palmer, the mother of Kaniyah's cousin, Kaziyah. JoAnne Palmer explained that both Kaziyah and Kaniyah were well cared for but that Kaniyah had been sexually assaulted in the winter of 2006 by a little boy. JoAnne explained that Plaintiff had taken care of the situation by taking Kaniyah to the hospital for a physical exam and alerting police. *Id*. The boy, who was 14 at the time of the assault, was named Jordan and was a friend of Kaniyah's mother. The assault occurred when Kaniyah was staying with her mother for a brief period of time in 2006. The physical exam following the assault was normal. (Investigation Summary 4; Tr. Custody Hrg. at 15-16; Pl.'s Cross Mot. Ex. 4, Emergency Treatment Note of Dr. Tonya Touchstone, 2.)

On June 8, 2007, Adams conducted a home assessment and interview with Plaintiff and Kaniyah. (Investigation Summary 4.) At the onset of the interview, Plaintiff was upset and stated that she suspected that a Ms. Outlaw, a former girlfriend of Plaintiff's son Corey, made these

4

anonymous allegations against Corey out of spite because Ms. Outlaw had found Corey in bed with another girl at Plaintiff's home. Adams explained to Plaintiff that the source of the allegations was confidential but asked if Corey lived in the home, in follow up to Plaintiff's statement that Corey was found in bed with a girl at Plaintiff's home. Plaintiff denied that Corey lived with her but indicated that he could best be reached at Plaintiff's home because he "lived here and there." *Id*. Kaniyah was very willing to engage with Ms. Adams during the home visit and stated that she lived in the home with her grandmother (Plaintiff) and her uncle Corey. Plaintiff interrupted Adams's interview with Kaniyah and stated that it didn't matter who lived in the house. Kaniyah stated that she often watches television in the basement with uncle Corey while her grandmother is upstairs in her bedroom. At this point in the interview, Plaintiff again interrupted and stated that she would never let anything bad happen to Kaniyah. Kaniyah's Aunt, Omega Palmer, who was giving additional information during the interview, also entered the room at this time, stating that no one would ever hurt Kaniyah and that if they did Kaniyah would tell someone. (*Id*.; Adams 11/1/11 Dep. 17;14-24, 20;9-15, 69:3-9.) The interview situation became unmanageable and the home interview was terminated. (Investigative Summary 5.) Adams directed Plaintiff to take Kaniyah to Children's Hospital for a sexual abuse exam by Monday, June 11, 2007, and also instructed Plaintiff to bring Kaniyah to the Children's Center for a Kids Talk Interview. *Id*.

On June 25, 2007, Ms. Adams again spoke by phone with Plaintiff to remind Plaintiff of the Kids Talk Interview that was scheduled for June 28, 2007, and to inquire whether Plaintiff had taken Kaniyah for a sexual abuse exam as instructed by Ms. Adams on June 7, 2007. *Id*. Ms. Palmer became loud and angry and stated that she had not taken Kaniyah for a sexual abuse exam and would not take her to the exam. Ms. Adams explained that if Plaintiff failed to take Kaniyah for an exam,

the Department of Human Services may file a petition to remove Kaniyah from the home. *Id.* On July 11, 2007, Ms. Adams was informed that Plaintiff had cancelled the Kids Talk Interview that had been scheduled for June 28, 2007. *Id.*

On August 1, 2007 a forensic interview with Ms. Adams and other Department of Human Services ("DHS") staff was conducted with Kaniyah at the Children's Center where Kaniyah had been attending regular therapy sessions with a Ms. Cindy Read for the previous year. (*Id.*; Tr. Custody Hrg. at 14.) Plaintiff had arranged for therapy sessions for Kaniyah beginning sometime in October or November, 2006 because Kaniyah had been acting out by having bowel movements and urinating in her pants, head banging, smearing feces on the wall and other out of control behavior. (Tr. Custody Hrg. at 15.) During the August 1, 2007 interview with DHS staff, Kaniyah became reserved and reticent to speak and asked to see her therapist, Ms. Read. (Investigation Summary 6.) Ms. Read then began to question Kaniyah about the allegations and when Kaniyah began to respond, Ms. Adams took over the interview; Ms. Read remained in the room. *Id.*

Kaniyah was asked if anyone ever touched her body and she responded yes, stating that her uncle Corey touched her vagina "on the inside" with "his dick" when she and uncle Corey had their clothes off. Kaniyah stated that she told her grandmother, the Plaintiff, that her uncle Corey touched her. Kaniyah was given dolls to demonstrate what happens when uncle Corey touches her vagina. Kaniyah laid the Corey doll on its back, identified a second doll as herself and laid it on top of the Corey doll. She then touched between the legs of the Kaniyah doll with her finger and said uncle Corey touched her there. When asked again what uncle Corey touched her with, Kaniyah repeated "his dick." *Id.* She demonstrated by touching the Kaniyah doll with slight force between the legs. Kaniyah again repeated that uncle Corey touches her vagina with his "dick" between her legs. *Id.*

Ms. Adams attempted but was unable to find and interview Corey Palmer. Ms. Adams acknowledged that she was required by the Children's Protective Services Manual of the State of Michigan (the "CPS Manual") to attempt to conduct an interview with the alleged perpetrator of the sexual abuse in Kaniyah's case. Ms. Adams testified that she is familiar with and is supposed to follow as closely as possible the CPS Manual. (Adams 1/11/11 Dep. 24:18-25:4.) In Kaniyah's case, Ms. Adams did not conduct an interview of the alleged perpetrator, Corey Palmer, because she was unable to locate him after several attempts, including an attempt by the WEB Unit of the Detroit Police Department to secure Corey Palmer's availability at the time that Kaniyah was removed from the home. (*Id.* at 28:5-32:6, 35:11-23, 37:16-23, 41:16-45:11, 57:2-58:15; Def.'s Resp. Ex. 12, March 19, 2008 Addendum.) Ms. Adams testified that it was her understanding of the Manual that she was required to document attempts to interview the alleged perpetrator, which she did in her Addendum to the Report. (Adams 1/11/11 Dep. at 40:14-24.)

Based upon the results of her investigation, Ms. Adams concluded that Kaniyah had been the victim of sexual abuse by her uncle, Corey Palmer. Ms. Adams further concluded that Kaniyah's grandmother and guardian, the Plaintiff, as well as Kaniyah's biological mother, Diamond Palmer, failed to protect Kaniyah from the abuse. At the time that Ms. Adams issued her conclusion, Plaintiff had failed to cooperate in the investigation and, although Plaintiff indicated on June 14, 2007 in a phone call to Plaintiff that she would take Kaniyah for a sexual abuse exam, on June 25, 2007 she retracted that statement and informed Ms. Adams that she was not going to take Kaniyah for the exam. (Investigative Summary 5, 6; December 17, 2011 Deposition of Sharon Adams, 225:10-24.) Ms. Adams evaluated the risk level in Kaniyah's case as intensive Category One and filed a petition to terminate parental rights and Plaintiff's guardianship. Also as a result of her

investigation, Ms. Adams placed Barbara Palmer, Diamond Palmer and Corey Palmer on the Michigan Central Registry which identifies individuals known to pose a potential threat to children. Plaintiff's subsequent request that her name be removed from the Central Registry was denied by the DHS. (Def.'s Mot. Exs. 4-7.)

Based upon the petition, on August 9, 2007 the Wayne County Circuit Court - Family Division, Judge Judy Hartsfield, issued an Order to Place Kaniyah in Protective Custody, authorizing her removal from Plaintiff's home. (Dkt. No. 27, Def.'s Resp. Ex. 1, Order to Place in Protective Custody.) Kaniyah was removed from the home by Detroit Police on August 9, 2007 and placed in Protective Custody with DHS for placement and care. Defendant Adams accompanied the police but was not involved in physically removing Kaniyah from the home.

On August 10, 2007, the day *after* Kaniyah was removed from the home, at a team meeting of members of the DHS including Ms. Adams, Plaintiff appeared and delivered an Emergency Treatment Note dated June 26, 2007 which reported the findings of Dr. Tonya Touchstone, MD of Children's Hospital following an exam of Kaniyah Palmer based upon a complaint of alleged sexual abuse. (Def.'s Mot. Ex. 13, Palmer Dep. 88:2-90:7; Pl.'s Cross Mot. Ex. 4, Touchstone Report.) Dr. Touchstone's notes indicate that Kaniyah's grandmother, the Plaintiff, was instructed by Child Protective Services to bring Kaniyah for a an exam for alleged sexual abuse. The note reiterates Plaintiff's belief that the anonymous allegations of abuse stemmed from Corey's girlfriend finding him in bed at Plaintiff's home with another girl. Dr. Touchstone reports that she was able to meet alone with Kaniyah who reported that Corey and Jordan had touched her "tutu" (vaginal area) and that Kaniyah also listed names of others whom she said had touched her, finally reporting that only Jordan had touched her "tutu." *Id*. at 2. Dr. Touchstone further indicated that Kaniyah had a normal

rectal examination, that her female genitalia was normal and her hymen was intact. *Id.*

On August 11, 2007, a Preliminary Hearing Following Removal was held in Wayne County Circuit Court - Family Division before Judge Kathleen W. Allen. (Def.'s Resp. Ex. 8, Order After Preliminary Hearing Following Removal.) Notice of the hearing was given as required by law and a probable cause determination was waived by all parties. *Id.* at 1 ¶ 9. The court found that it was contrary to Kaniyah's welfare to remain in Plaintiff's home because Plaintiff, Kaniyah's legal guardian, was unable to protect Kaniyah from sexual abuse in her home and Diamond Palmer, Kaniyah's mother, could not provide for the child due to her own neglect and prior terminations of parental rights in favor of Plaintiff as Kaniyah's guardian. *Id. ¶* 12. The Court further determined that no other arrangement aside from removal of Kaniyah from Plaintiff's home could adequately protect Kaniyah from the risk of further harm. *Id.* ¶ 17. The court further determined that parenting time with Plaintiff and/or Diamond Palmer, even if supervised, may be harmful to Kaniyah and suspended visitation pending psychological counseling and evaluation. The court further acknowledged that a petition to terminate Plaintiff's guardianship and a petition to terminate Diamond Palmer's parental rights were to be filed soon. *Id.* ¶¶ 19, 29.

On September 7, 2007, the DHS, in a letter to the Wayne County Probate Court, requested administrative termination of Plaintiff's guardianship over Kaniyah. (Def.'s Mot. Ex. 18.) On September 9, 2007, a pre-trial hearing was held in Wayne County Circuit Court at which Plaintiff and Kaniyah's mother, Diamond Palmer, appeared with separate counsel, along with counsel for the DHS and counsel representing the interests of Kaniyah. (Def.'s Mot. Ex. 20, Transcript of September 9, 2007 Pretrial Hearing before the Honorable Mark T. Slavens.) At the hearing, counsel for the DHS indicated that they intended to pursue termination of Plaintiff's guardianship. *Id.* at 5.

At the pre-trial hearing, Plaintiff's counsel presented a motion for visitation/parenting time on behalf of Plaintiff.  In support of the motion for visitation rights, counsel for Plaintiff brought to the court's attention Dr. Touchstone's medical report, that was produced only after Kaniyah was removed the house.  Counsel began to argue the merits of the petition for termination of guardianship, claiming that the medical report did not substantiate the allegations of sexual abuse in the petition.  *Id*. at 8. The DHS, which had only received Plaintiff's motion for visitation at the pre-trial hearing, argued that the DHS intended to obtain an administrative termination of guardianship, pursuant to which there would be no right to visitation.  The DHS explained to the court that this would occur before the court could hold a hearing on the motion for visitation, thus rendering the motion moot.  *Id*. at 9-10.  The court did not decide Plaintiff's motion for visitation at the pre-trial hearing and scheduled the motion for hearing at a later date.  Also at the pre-trial hearing the court granted Kaniyah's mother, Diamond Palmer, supervised visitation at the agency.  *Id*. at 12.  On September 14, 2007, pursuant to Mich. Ct. R. 5.404(F)(3)(b), Plaintiff's guardianship was administratively terminated and Plaintiff was removed as guardian, rendering Plaintiff's motion for visitation moot.  (Def.'s Mot. Ex. 18.)

On October 25, 2007, the Permanent Custody Trial & Disposition was held in Wayne County Circuit Court - Family Division, before the Honorable Leslie Kim Smith.  (Def.'a Mot. Ex. 3, Tr. Custody Hrg. 1.)  Appearing at the hearing and represented by separate counsel were Kaniyah's mother, Diamond Palmer, and Kaniyah's father, Anthony Morris (by telephone from prison).  Also present were counsel for the DHS, counsel representing Kaniyah's interests, Kaniyah's therapist Cindy Read and Ashley Lightsey, the foster care worker, who supervised and observed Kaniyah's visits with her mother, Diamond Palmer.  Plaintiff was present in the courtroom but not a participant

10

in the proceedings.

Diamond Palmer testified at the hearing that she had been made aware that her daughter, Kaniyah, was sexually abused while in Plaintiff's care. She testified that she had been made aware that the alleged perpetrator was her older brother, Corey Palmer, and that she was now aware that Corey would be a threat to Kaniyah. Diamond Palmer testified that she currently had no income and no independent housing and suffered from depression. *Id*. at 7-10. Mr. Morris, Kaniyah's father, testified from prison in South Carolina that he was sentenced to incarceration until 2028 for cocaine trafficking but that he had an appeal pending. *Id*. at 11-12. Based on this testimony, the court found, by a preponderance of the evidence, that Kaniyah was a temporary ward of the State and directed the DHS to prepare a treatment plan for the parents and took testimony on the proposed Foster Care Initiative. *Id*. at 13.

The court then heard testimony from Ms. Cindy Read, Kaniyah's therapist, who testified that when Kaniyah first began treating with Ms. Read in October, 2006, Kaniyah was acting out by, among other things, defecating and urinating in her pants, head banging, and throwing temper tantrums. *Id*. at 15. Ms. Read testified that in December (2006) or January (2007) Plaintiff asked Ms. Read to counsel Kaniyah regarding the instance of sexual abuse that occurred when Kaniyah was staying with her mother, allegedly by a friend of Diamond Palmer's named Jordan. Kaniyah was four or five at the time Ms. Read began to work with her and was unable to express what had occurred with Jordan. Ms. Read continued to work with Kaniyah on her anger and tried to get Kaniyah to express her feelings through drawings. Ms. Read testified that in May, 2007, after the allegations surfaced regarding Kaniyah's uncle Corey, Kaniyah became more and more withdrawn and expressed to Ms. Read that uncle Corey was touching her. *Id*. 16-18. Ms. Read confirmed that

11

on one occasion Kaniyah had used the word "dick" when referring to how uncle Corey touched her. At this point in the hearing, an unidentified female (later identified as Plaintiff) disrupted the proceedings and shouted "That's a lie," and screamed "All lies," multiple times until she was quieted by the courtroom deputy and left the courtroom. *Id*. at 18-19.  Ms. Read testified that after the allegations regarding Corey, Kaniyah did not want to go home and expressed that she wanted to live with Ms. Read or with "Will," another DHS employee.  Ms. Read testified that it was her understanding that Kaniyah lived with Plaintiff but also that Corey Palmer and Diamond Palmer lived in Plaintiff's home from time to time.  Ms. Read testified that Kaniyah was doing well with her foster family, the Rias family, but that after supervised visits with her mother, Diamond Palmer, Kaniyah started acting out again, both at school and at home. *Id.* 20-22.  Ms. Read recommended to the court that Kaniyah's visits with her mother, Diamond Palmer, be stopped so that DHS could attempt to determine if Kaniyah's increased agitation and acting out was related to the visits with her mother. *Id*. at 24.

Ultimately, the court directed that Kaniyah's mother, Diamond Palmer, participate in several programs, undergo random drug screens and psychiatric exams, and verify income, toward the goal of perhaps obtaining custody of Kaniyah in the future.  The court also suspended Diamond Palmer's visits with Kaniyah for a period of time.  Finally, the court directed that, based on the Plaintiff's behavior in court that day - boisterously and disruptively continuing to deny the allegations of abuse by Corey Palmer - all visits by Plaintiff were also suspended.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a

summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment.

13

*Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The rule requires the  non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).  "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

## III.    ANALYSIS

It is important to observe at the outset that the issue of Kaniyah's welfare or proper placement is not before this Court.  "[T]he children's best interest, which is not before this court, and as to which this court holds no view, [has no] bearing on the sole issue at bar, which is whether [Adams is liable to Plaintiff] in a § 1983 suit for monetary damages for her actions."  *Holloway v. Brush*, 220 F.3d 767, 779 (6th Cir. 2000).  Plaintiff claims that Defendant Adams is liable to her for money damages based upon: (1) Adams's alleged unconstitutional interference with Plaintiff's right of familial association by improperly investigating allegations of sexual abuse and ultimately securing an order for Kaniyah's removal from Plaintiff's home (Count I); (2) Adams's alleged denial of due process in failing to remove Plaintiff's name from the Michigan Central Registry (Count II); and (3) Adams's gross negligence in carrying out her statutory duty to investigate and properly determine whether Kaniyah was sexually abused (Count III).

14

A.      **Threshold Issues: *Rooker-Feldman* and Collateral Estoppel**

Defendant argues that this Court lacks jurisdiction over Plaintiff's 42 U.S.C. § 1983 claims based on the *Rooker-Feldman*[2] doctrine or alternatively that Plaintiff's claims are barred by principles of collateral estoppel.  The Court disagrees.  In several decisions, courts in the Sixth Circuit and this district have recognized that a section 1983 action that asserts a claim for money damages and does not seek to overturn a state court decision regarding custody is not barred by the *Rooker-Feldman* doctrine.  *See e.g. Holloway*, 220 F.3d at 778-79 (section 1983 action claiming damages caused by constitutional violations committed in the process of removing children from the home not barred by the state court custody award); *Pittman v. Cuyahoga County Dep't of Children and Family Services*, 241 F. App'x 285, 288 (6th Cir. 2007) (holding that father, who had lost a custody battle in state court, could maintain a § 1983 action in federal court challenging not the state court custody order but the conduct of the defendants in securing that order, an independent action not barred by *Rooker-Feldman*);  *Kolley v. Adult Protective Services*, 786 F. Supp. 2d 1277, 1287-90 (E.D. Mich. 2011) (concluding that *Rooker-Feldman* did not bar a father's action challenging the conduct of the defendants in removing a child from the home where plaintiff did not claim that the state court orders of removal were themselves unconstitutional but that the defendants obtained the orders through false and fraudulent conduct, a separate and independent claim under

---

[2]  The *Rooker-Feldman* Doctrine derives its name from two United States Supreme Court cases interpreting 28 U.S.C. §1257(a), which vests review of state court judgments in the Supreme Court.  *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923).  "[28 U.S.C. §1257(a)] is designed to prohibit end-runs around state court judgments that might occur when parties go into federal court essentially seeking a review of a state-court decision."  *Kovacic v. Cuyahoga County Dept of Children and Family Services*, 606 F.3d 301, 308 (6th Cir. 2010).

15

section 1983 for money damages).[3]

**B.     Even Assuming that Plaintiff Could Establish a Fundamental Right to Familial Association, Her Substantive Due Process Claim Would be Barred by Absolute and/or Qualified Immunity**

Plaintiff's first constitutional claim is that Defendant Adams violated her right to familial association by (1) conducting a faulty and erroneous investigation into allegations that Plaintiff's son, Corey Palmer, sexually assaulted Plaintiff's granddaughter, Kaniyah, in Plaintiff's home,  (2) concluding that Plaintiff failed to protect Kaniyah and (3) petitioning the state court to remove Kaniyah from the home.  Plaintiff claims that Defendant failed to comply with certain provisions of the Michigan Child Protection Services Manual and Forensic Interview Protocol when conducting her investigation.  Specifically, Plaintiff claims that Adams (1) failed to consider the findings of a medical report in violation of CFP 713-4 (Pl.'s Cross Mot. Ex. 5); (2) failed to interview the alleged perpetrator in violation CFP 713-8(3) (Pl.'s Cross Mot. Ex. 3); (3) failed to interview Kaniyah's aunt Omega Palmer in violation of CFP 713-1 (Pl.'s Cross Mot. Ex. 2); (4) violated the Forensic Interviewing Protocol by allowing Kaniyah's therapist, Ms. Read, to initiate the interview and to remain in the room while Adams conducted the interview.

**1.     A grandparent's fundamental right to familial association.**

42 U.S.C. § 1983 does not create substantive rights.  It only provides remedies for violations of rights found elsewhere in the Constitution.  *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979).

---

[3] On the facts of this case, arguments based on principles of collateral estoppel would also fail.  *See Kolley*, 786 F. Supp. 2d at 1289-90 (where the state court finding of probable cause was based upon information that plaintiff alleges was false or fraudulent, this court is not collaterally estopped from determining the claims involved in plaintiff's section 1983 action because plaintiff never had a full and fair opportunity to litigate the issue in state court where the allegations of fraud were never formally presented to the state court).

"To successfully establish a claim under § 1983, a claimant must show that he or she was deprived of a right secured by the Constitution and the laws of the United States by one acting under the color of law." *Ahlers v. Schebil*, 188 F.3d 365 (6th Cir.1999) (internal citations omitted). Thus, as an initial matter on her substantive due process claim, Plaintiff must establish that, as the grandmother and former legal guardian of Kaniyah, she had a right to familial association that is protected by the Constitution.  "[C]ourts have concluded that a parent's liberty interest in familial association is implicated where a child is removed from his or her parent's care and custody." *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006).   For this reason, "a state agent must provide sufficient due process before terminating parental rights, or before removing a child from his or her parent's custody." *Id*.  "[T]he Supreme Court described 'the fundamental right of parents to make decisions concerning the care, custody, and control of their children' as perhaps 'the oldest of the fundamental liberty interests recognized by this Court.' This right to familial association has been recognized by the Court and protected in numerous others cases."  *Kottmyer*, 436 F.3d at 690 (quoting *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) and citing *Lehr v. Robertson*, 463 U.S. 248 (1983) and *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)).

Whether this right of parental association attaches to grandparents and other extended family members is not well agreed upon.  *See Rees v. Office of Children and Youth*, 744 F. Supp. 2d 434, 444-53 (W.D. Pa. 2010) (collecting cases).  In *Johnson v. City of Cincinnati*, 310 F.3d 484, 501 (6th Cir. 2002), the Sixth Circuit found that a grandmother who had been "an active participant in the lives and activities of her grandchildren . . . has a fundamental associational right to participate in the education and rearing of her grandchild."  Defendants rely on several Michigan cases that decline to extend the same rights of  "care, custody and management of their child" enjoyed by

17

natural parents to grandparents. *See, e.g. Johnson v. White*, 261 Mich. App. 332, 344 (2004) (finding that "grandparents do not have a fundamental right to make decisions for their grandchild"); *In re Westfield*, No. 218535, 1999 WL 33327195, at *2 (Mich. Ct. App. Dec. 17, 1999) ("precedent suggests that grandparents have no greater claim to custody than any other persons").

The Court notes that many of the factors, such as longevity of relationship and connectedness between a grandparent and grandchild, that have persuaded other courts to recognize such a right, are present in this case. Plaintiff has been Kaniyah's legal guardian and the sole custodian of Kaniyah since her birth. Although the state court terminated Plaintiff's guardianship after finding that she failed to protect Kaniyah from sexual abuse by her uncle Corey, Plaintiff is the only custodial parent Kaniyah has ever known. However, in the instant case, the Court need not decide this issue because any claim based upon such a right (which first would have to be shown to have been clearly established at the time of Defendant's investigation) would be defeated by either absolute or qualified immunity.

### 2. Social Worker Absolute Immunity

"[S]tate employees who are responsible for the prosecution of child neglect and delinquency petitions in the Michigan courts[] . . . must be able to perform the necessary tasks to achieve this goal without the worry of intimidation and harassment from dissatisfied parents." *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984). "[S]ocial workers are absolutely immune only when they are acting in their capacity as *legal advocates* – initiating court actions or testifying under oath – not when they are performing administrative, investigative, or other functions." *Holloway*, 220 F.3d at 775 (emphasis in original).

The Sixth Circuit recently reiterated these principles in *Pittman v. Cuyahoga County Dept.*

18

*of Children and Family Servs.*, 640 F.3d 716, 724-25 (6th Cir. 2011), a case that the Sixth Circuit had previously remanded to the district court, reversing the district court's ruling that plaintiff's claims were barred by *Rooker-Feldman*.  Plaintiff in *Pittman* alleged that the social worker responsible for filing a petition for protective custody of plaintiff's child made false accusations and misrepresentations regarding plaintiff in her petition.  On remand, the district court denied the social worker's motion for summary judgment.  The social worker appealed and the Sixth Circuit reversed, finding that the social worker was absolutely immune:

> [F]amily service workers [are] absolutely immune from liability in filing [a] juvenile abuse petition, due to their quasi-prosecutorial function in the initiation of child abuse proceedings. The filing of the affidavit—which reflects Hurry's opinion "[t]hat permanent custody is in the best interest of [Najee and B.W.]"—represents precisely the sort of conduct within a social worker's absolute immunity for her testimony or recommendations given in court concerning the child's best interests as she saw the matter.

640 F.3d at 724-25 (internal quotation marks and citations omitted).  Thus, like the related concept of prosecutorial immunity, social worker immunity "bars § 1983 suits arising out of even unquestionably illegal or improper conduct by the [social worker]." *Id*. at 725.  The Sixth Circuit in *Pittman* recalled Judge Learned Hand's explanation for what may appear to be the unfairness in granting absolute immunity for such conduct: "[A]bsolute immunity represents 'a balance between . . . evils'; '[I]t has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.'" *Id*. at 726 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)).

    The Sixth Circuit has expressly extended the cloak of social worker absolute immunity to the actions of social workers taken in the course of their investigations which lead to the petitions that they file: "Neither can Pittman circumvent Hurry's absolute immunity for filing the complaint

and affidavits by stating a claim based on 'her underlying action in failing to properly investigate [him], which led her to put false information' in those documents." *Pittman*, 640 F.3d at 726.  Thus, absolute immunity extends to social workers who allegedly "fail[] to conduct a careful investigation before incorporating [] false accusations in [a child abuse] petition." *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 421 (6th Cir. 2001).  In *Rippy* the Sixth Circuit explained that a social worker's job is to make recommendations to the court regarding placement and protection of children and that they were absolutely protected from suit with respect to such functions, "including the underlying investigation [which is] intimately related to the judicial phase of child custody proceedings." *Id*. at 422-23.

Plaintiff's reliance on *Achterhof v. Selvaggio*, 886 F.2d 826 (6th Cir. 1989) is misplaced.  In that case the social worker initiated an investigation that never resulted in filing of a petition.  The Sixth Circuit held that his decision to "open a case" for purposes of investigation was not entitled to absolute immunity because it was "only investigatory or administrative in nature, not prosecutorial, judicial or otherwise intimately related to the judicial process." *Id*. at 830.  The instant case involved a social worker whose recommendations were presented in court and resulted in removal of a child by court order from Plaintiff's home.  Accordingly, the Court concludes that "[Adams's] absolute immunity also protects her from [Plaintiff's] claim that her allegedly false assertions in the complaint and affidavits stem from an inadequate investigation." *Pittman*, 640 F.3d at 726.[4]

---

[4] Plaintiff also appears to claim that she was denied her right to familial association through the termination of her guardianship without notice of a hearing.  Plaintiff does not clearly articulate the legal basis for this theory, which appears to be more in the nature of a procedural due process claim than a substantive due process claim, although the allegation appears in Count I of Plaintiff's Complaint alleging violation of substantive due process.  In any event, her claim of lack of notice

3.      **Qualified Immunity**

To the extent that any of Adams's actions in her investigation and petitioning the court for Kaniyah's removal could be considered to be "unrelated to her role as an advocate before the juvenile court," Adams claims that such conduct is still protected by the doctrine of qualified immunity.  Qualified immunity protects government officials from civil liability unless, "in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir. 2009).  There are two relevant inquiries in determining whether a defendant is entitled to qualified immunity: (1) "whether viewed in the light most favorable to plaintiff, the facts show that the officer's conduct violated a constitutional right[,]" and (2) "whether the constitutional right was 'clearly established' at the time of the violation." *Id*. at 975.  "Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).  This defense "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id*. (citations and punctuation omitted).

The allegations that support Plaintiff's claim that Adams's erroneous and faulty investigation

---

of the DHS's decision to request termination of her guardianship rings hollow.  At the September 9, 2007 pretrial hearing before Judge Slavens, at which Plaintiff was present and represented by counsel, the attorney for the DHS made it very clear that the DHS was going to seek termination of Plaintiff's guardianship.  "[T]he minute I get back to my office, I intend to file to administratively terminate the guardianship." (Def.'s Mot. Ex. 20, p. 10, by Ms. Handren, counsel for the DHS.)  The fact that Plaintiff's guardianship had been terminated also was raised at the custody trial, when Plaintiff also had her visitation rights terminated due to her conduct at that hearing.  (Def.'s Mot. Ex. 3, 46-47.)  Plaintiff cites no authority for her claim that she was entitled to a hearing on the termination of her guardianship and furthermore the record demonstrates that she was notified that termination of her guardianship would be sought on September 7, 2007.

2:10-cv-14500-PDB-RSW Doc # 31 Filed 06/08/12 Pg 22 of 33 Pg ID 1576

violated Plaintiff's substantive due process rights are the same allegations that underlie her claim of gross negligence; that Adams failed to follow the guidelines set forth in the Child Protection Services Manual and Forensic Interview Protocol. These allegations are discussed in detail in section III C *infra*. Importantly, Plaintiff provides no legal support for her theory that failure to conduct an investigation in strict compliance with the CFP and Forensic Interview Protocol amounts to a violation of a clearly established constitutional right. Even were such a right clearly established at the time that Adams conducted her investigation, the Court concludes that, to the extent that any of her conduct can be characterized as falling outside her role as advocate, Adams conduct was that of a reasonably competent social worker under the given circumstances and she would be entitled to qualified immunity.

First, it is undisputed that the medical report indicating that Kaniyah's hymen was intact was not provided until *after* Adams filed the petition and after Kaniyah was removed from the home. In any event, an intact hymen and normal genital exam are not dispositive on the issue of sexual abuse and there is no evidence that had Adams considered the report, her conclusion would have been any different. Importantly, this information was brought to the attention of each judicial officer who affirmed Adams's findings and conclusions and ultimately authorized Kaniyah's removal from the home. Second, Adams explained in an addendum to her report the reasons that she was unable to interview Corey Palmer and this addendum satisfied the requirements of the CFP. Third, Adams did conduct a partial interview of Omega Palmer and there is no evidence that a further interview of Omega would have yielded information contraindicating that removal of Kaniyah from the home was necessary to protect Kaniyah. Finally, there is no evidence that Ms. Read's initiating the interview in any way tainted the forensic interview.

Undisputed in this case are the vivid accounts of sexual abuse by her Uncle Corey that Kaniyah described to several of her caregivers and her extreme acting out behaviors that were noted by her therapist to have been exacerbated by any contact with family members. It is also undisputed that Plaintiff steadfastly denied the allegations regarding Corey and refused to consider that Kaniyah had been harmed, resulting in the state court *sua sponte* suspending Plaintiff's visitation rights. The Court finds that Ms. Adams's conclusions, based upon her four month investigation, that Kaniyah had been sexually abused in Plaintiff's home and that Plaintiff could not protect Kaniyah from further abuse, were those of a reasonably competent social worker. Because Adams's conduct did not violate Plaintiff's substantive due process rights, Adams is entitled to qualified immunity on that claim.

Additionally, Ms. Adams is entitled to qualified immunity for a more fundamental reason - it was not *her* conduct that can be said to have violated Plaintiff's right to familial association. It was the state court, and not Defendant Adams, who deprived Plaintiff of any right she might claim to have had to familial association. Under well-established Sixth Circuit precedent, only the state court could deprive Plaintiff of any such fundamental right. "Because the juvenile court has the ultimate decisionmaking power with respect to placement and custody, it alone could deprive [Plaintiff] of [her] fundamental right. Therefore, [Adams's] conduct did not violate [Plaintiff's] substantive due process rights, and [Adams] has qualified immunity against that claim." *Pittman*, 640 F.3d at 729. *See also LeBeau v. Michigan Dep't of Human Services*, No. 10-12624, 2011 WL 4962386, at * (E.D. Mich. Oct. 19, 2011) (finding that only the state trial court could deprive plaintiff of a right to familial association and therefore defendant social worker who lacked that authority cannot be said to have deprived plaintiff of that right).

Adams filed a petition and made recommendations to the Wayne County Circuit Court, but the Court, not Adams, made the final decision to terminate Plaintiff's guardianship and to place Kaniyah in the custody of the State.  Plaintiff recognizes in her brief that Adams petitioned the juvenile court for a removal order to implement her recommendation, based upon her investigation, that Kaniyah be removed Plaintiff's home, and that the court then granted an order of removal.  (Dkt. No. 28, Pl.'s Resp. 12.)  The Wayne County Circuit Court determined at the preliminary hearing that Plaintiff was unable to protect Kaniyah from sexual abuse in her home and that Diamond Palmer, Kaniyah's biological mother, could not protect Kaniyah due to her own neglect and the prior termination of her parental rights. Not insignificantly, the state court ultimately made its decision to terminate guardianship and parental rights with full knowledge of the medical report from Dr. Touchstone that Plaintiff claims Adams fatally neglected to consider in her investigation.  Also, importantly, Plaintiff, who was still Kaniyah's legal guardian at the time, appeared at the pretrial hearing on the custody issue, represented by counsel, at which time the findings of the medical report were disclosed to the state court judge.  Plaintiff also appeared at the trial on the custody issue, although she was not a party to that hearing given that her guardianship had been terminated at that time, and disrupted proceedings with her claim that the testimony being given was "all lies." Not only did the state court not heed Plaintiff's claims, the judge *sua sponte* terminated Plaintiff's visitation rights based on her behavior in court that day.  There is no question that the state court ultimately terminated Plaintiff's guardianship, placed Kaniyah in the protective custody of the state and finally into foster care.[5]  Adams is entitled to qualified immunity on this claim.

---

[5] Defendants also argue that they are entitled to statutory immunity pursuant to M.C.L. § 722.625, which states in pertinent part:

24

**C.     Plaintiff's Procedural Due Process Claim Based Upon Defendant's Placement of Plaintiff's Name on the Central Registry Fails to Identify the Deprivation of a Constitutional Right**

Plaintiff's second constitutional claim is that Adams violated her constitutional right to due process by placing her name on the Michigan Central Registry and failing to remove her name from the Central Registry when requested. Unlike Adams's conduct related to the investigation of allegations of sexual abuse and petitioning for Kaniyah's removal from Plaintiff's home based on that investigation, Adams actions in placing Plaintiff's name on the Central Registry are administrative in nature and therefore not entitled to absolute immunity. *Achterhof*, 886 F.2d at 830-31 ("Selvaggio's placement of James Achterhof's name on the central registry was not entitled to absolute immunity. This action was administrative in nature, not prosecutorial.")

Plaintiff relies on *Achterhof* in support of her claim that Adams violated Plaintiff's due process rights in placing Plaintiff's name on the Central Registry and failing to remove Plaintiff's name when requested. "To establish a violation of his procedural due process rights, [Plaintiff] must show (1) that he was deprived of a protected liberty or property interest, and (2) that such deprivation occurred without the requisite due process of law." *Pittman*, 640 F.3d at 729 (internal quotation marks and citations omitted).

---

A person acting in good faith who makes a report, cooperates in an investigation, or assists in any other requirement of this act is immune from civil or criminal liability that might otherwise be incurred by that action. A person making a report or assisting in any other requirement of this act is presumed to have acted in good faith.

Defendants argue that this statute bars all claims related to the investigation and subsequent petition for removal of the Plaintiff minor children. Because the Court finds that Plaintiff's claims relating to the investigation and subsequent petition for removal are barred by absolute and/or qualified immunity, the Court need not address this alternate argument.

25

On October 29, 2007, Plaintiff sent a letter to the DHS requesting that her name be removed from the Central Registry. (Def.'s Mot. Ex. 5.) On November 8, 2007, her request was forwarded for review and investigation to determine whether expungement was appropriate. (Def.'s Mot. Ex. 6.) On December 6, 2007, Plaintiff was informed by letter that her request was denied because a preponderance of the evidence supported the failure to protect allegations. (Def.'s Mot. Ex. 7.) This notice explained to Plaintiff in bold print her right to request a hearing to present her case to an impartial administrative law judge. *Id.* Defendant provided affidavit testimony that Plaintiff never requested such a hearing. (Def.'s Mot. Exs. 8, 9.) Indeed, Plaintiff does not deny that she never requested a hearing before an impartial administrative law judge, as was her right under the state law procedures. Having failed to avail herself of the available procedures that may have rectified the alleged deprivation, she cannot now claim to have been deprived of the process that she chose not to seek. "[Plaintiff] took advantage of none of these available procedures, and therefore cannot now claim a denial of due process." *In re Ellingsen MacLean Oil Co., Inc.*, 834 F.2d 599, 604 (6th Cir. 1987). Plaintiff was given the opportunity to challenge the determination not to remove her name from the Central Registry by filing an administrative appeal. Plaintiff does not challenge the procedure itself and cannot assert a due process claim when she has failed to avail herself of the available state remedies. This is not an issue of exhaustion but of finality. *Bowers v. City of Flint*, 325 F.3d 758, 762 (6th Cir. 2003) (recognizing that in order to make a § 1983 claim for a procedural due process violation, a plaintiff must have attempted to obtain relief through established state procedures).

Plaintiff's 42 U.S.C. § 1983 claim based upon the placement of her name on, and failure to remove her name from, the Central Registry fails to identify the deprivation of a constitutional right.

26

Having found no constitutional violation, the Court need not inquire into the availability of a qualified immunity defense. The Court notes, however, that Defendant Adams had no involvement in the decision to deny Plaintiff's request to expunge her name from the Central Registry. Defendant Adams is entitled to summary judgment on this claim.

### D.    Plaintiff's Gross Negligence Claim is Barred by Michigan's Governmental Immunity Statute

The Michigan Supreme Court articulated the test for determining whether an individual defendant is entitled to governmental immunity under Michigan state law in *Odom v. Wayne County*, 482 Mich. 459 (2008). The *Odom* court clarified the intersection between Section 7 of the Governmental Tort Liability Act ("GTLA") and *Ross v. Consumers Power Co. (On Rehearing)*, 420 Mich. 567 (1984). *Odom*, 482 Mich. at 467-68. In 1984, *Ross* comprehensively described the common-law test for individual governmental immunity for all tort actions. *Id.* at 468. The court held that judges, legislators, and the highest executive officials of all levels of government were immune from all tort liability when acting within the scope of their governmental authority. *Ross*, 420 Mich. at 633. Lower-level officials were immune under the theory of qualified immunity if: their acts were taken during the course of employment and within the scope of that employment; they were taken in good faith; and they were discretionary/decisional, but not ministerial/operational. *Id.* at 633-34.

In 1986, the Michigan State Legislature amended the GTLA, adopting section 7, in response to *Ross*. *Odom*, 482 Mich. at 468. Section 7(2) affords individual immunity to government officials "without regard to the discretionary or ministerial nature of the conduct in question," when the actions were in the course of employment and (a) the employee "reasonably believes he or she is acting within the scope of his or her authority;" (b) while discharging a governmental function; and

(c) the conduct "does not amount to gross negligence that is the proximate cause of the injury or damage." *Id.* at 468-69. The Sixth Circuit has instructed that under Michigan law, "[s]tatutory grants of government immunity should be broadly construed, with exceptions construed narrowly." *Smith v. County of Lenawee*, 600 F.3d 686, 690 (6th Cir. 2010). Gross negligence is defined in the statute as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(7)(a). "It is not sufficient for plaintiff merely to show that the individual defendants acted without probable cause." *Odom*, 482 Mich. at 474.

The Court concludes that Defendant Adams's conduct in investigating the allegations of sexual abuse and recommending Kaniyah's removal from the home does not amount to gross negligence. Plaintiff's gross negligence claim is based on the following allegations:

> (1) Defendant failed to consider the medical report of Dr. Touchstone which indicated that Kaniyah's hymen was intact and that her genital exam was normal.
>
> (2) Defendant failed to interview the perpetrator, Corey Palmer, in violation of CFP 713-8(3).
>
> (3) Defendant failed to interview Kaniyah's aunt Omega, an adult who lived in Kaniyah's home, in violation of CFP 713-1.
>
> (4) Defendant conducted a forensic interview in violation of protocol by allowing Cindy Read, Kaniyah's therapist, to initiate questioning and remain in the room during the interview.

Pl.'s Cross Mot. 22-23. The Court concludes that Defendant Adams's conduct described in these allegations does not amount to "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."[6]

---

[6] Although not necessary to the Court's decision, the Court finds persuasive Defendant's argument that Plaintiff has failed to establish the requisite proximate cause necessary to defeat a claim of individual governmental immunity. Under MCL 691.1407(2)(c), Plaintiff must demonstrate that the behavior of the governmental employee was "the one most immediate, efficient, and proximate

*Failure to Consider the Medical Report.* There is no question that Adams did not have this report at the time she arrived at her conclusion that the allegations of abuse had been substantiated. Adams received the report on August 10, 2007, the day after Kaniyah was removed from the home. Plaintiff claims, however, that she told Adams that she would comply with the request to take Kaniyah for a sexual abuse exam and that therefore Adams should have followed up and sought out the report on her own. While it is true that on June 14, 2007, Plaintiff indicated that she would comply with Adams's request, on June 25, 2007 she clearly stated to Adams that she was not going to take Kaniyah for a sexual abuse exam. Additionally, Plaintiff has offered no evidence to support the suggestion that the substantiation of the allegations would have been any different had Adams had the benefit of Dr. Touchstone's report. The state court, which clearly did have the benefit of the medical report, was not persuaded to deny the petition or even to call for further evidence or testimony based upon Dr. Touchstone's report.

Moreover, Dr. Touchstone made no affirmative finding of no sexual abuse. She merely found that Kaniyah's hymen was intact and that the exam was otherwise normal. As noted in the CPS Manual on which Plaintiff so heavily relies for other propositions, in the majority of sexual abuse cases, medical findings are normal: "Commonly, accepted medical findings indicate that there is no physical evidence in the majority of sexual abuse cases. Substantiation will usually depend upon skilled interviewing of the child and collateral contacts, including statements made by children to physicians." CFP 713-4. Dr. Touchstone's report indicates that Kaniyah told her that uncle Corey

---

cause of the injury or damage." *Robinson v. Detroit*, 462 Mich. 439, 462 (2000). As discussed at length above, the state court, not the Defendant, was the entity responsible for authorizing Kaniyah's removal from Plaintiff's home and the Detroit police, not the Defendant, were responsible for executing the court order and removing Kaniyah from the home.

touched her "tutu" (vagina).  If anything, this confirms the conclusion reached by Adams without benefit of Dr. Touchstone's report.  While Kaniyah also stated to Dr. Touchstone that others had also touched her "tutu," this renders the evidence at best equivocal.  In short, the failure to consider Dr. Touchstone's report does not amount to "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."

*Failure to Interview Corey Palmer*.  In fact the CFP requires that an investigator *attempt* to interview the alleged perpetrator and if unable to do so, that the investigator document why an interview was not conducted.  In her addendum to her Investigation Summary, Adams explains exactly why she was unable to locate and conduct an interview with Corey Palmer and therefore she was in compliance with the CFP.  (Def.'s Mot. Ex. 11.)

*Failure to Interview Omega Palmer*.  Adams testified that Omega Palmer was present when Adams first visited Plaintiff's home and attempted to interview Plaintiff.  Adams testified that Omega participated in the interview and offered information at that time.  While Adams concedes that she did not conduct a subsequent, full interview of Omega, this does not amount to willful or reckless conduct.  There is no evidence that Omega Palmer, who lived part-time with Plaintiff and Kaniyah, had anything more substantive to offer than she volunteered during the initial home visit, which in any event was unhelpfully defensive.  The failure to interview Omega does not amount to "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."

*Conducting a Forensic Interview with Kaniyah's Therapist Present*.  Adams testified that at the beginning of the forensic interview of Kaniyah, Kaniyah asked for Cindy Read, her therapist.  Adams brought Ms. Read into the interview and permitted her to initiate a conversation with Kaniyah relating to the abuse allegations.  Once Kaniyah began to feel comfortable and engaged in

30

the conversation, Ms. Adams took over the interview, although Ms. Read remained in the room. Plaintiff does not dispute these facts. Plaintiff alleges that allowing Ms. Read to just initiate the questioning was a violation of protocol that in and of itself amounted to gross negligence. The Court must reject this suggestion. There is no evidence that Ms. Read or Adams asked inappropriate questions or somehow attempted lead or suggest things to Kaniyah. There is simply nothing alleged that could be characterized as willful conduct or a demonstration of a reckless lack of concern for resulting injury. The conduct alleged by Plaintiff stands in contrast to the type of coercive behavior that Michigan courts have supposed might constitute gross negligence:

> Assuming, arguendo, that there is some merit to plaintiff's criticisms of Allen's methods, he has not shown any flaw that renders the methods so reckless as to demonstrate a substantial lack of concern for whether an injury results. The Care House interview transcript does not reveal that Allen asked leading or suggestive questions, or that she prodded, coaxed, coached, or coerced the girls into making allegations of sexual abuse. Without prompting, the girls freely related how plaintiff "peeked" under their clothes, prohibited them from closing the bathroom and bedroom doors, or from pulling the shower curtain closed, "barged" into the bathroom when they were bathing, and slept with one daughter. There is no indication that Allen persuaded the girls to speak, or used any threats or promises to induce their cooperation with the interviews.

*McCarthy v. Scofield*, No. 284129, 2009 WL 3235639, at *5 (Mich. Ct. App. Oct. 8, 2009) (unpublished).

So too here. There is no suggestion that Adams engaged in any coercive or suggestive interview tactics, or that she prodded or coaxed Kaniyah into telling her story. Ms. Adams invited Ms. Read in only at Kaniyah's request and with the hope of allowing Kaniyah to feel comfortable opening up about the allegations. Kaniyah proceeded to tell her story in great, and in fact surprising, detail without further involvement of Ms. Read. Even assuming that Adams violated protocol by allowing Ms. Read to initiate the conversation with Kaniyah, this is not "conduct so reckless as to

31

demonstrate a substantial lack of concern for whether an injury results."

## IV.     CONCLUSION

Defendant Adams is entitled to absolute immunity on Plaintiff's substantive due process claim which is premised upon Adams's actions as an advocate in investigating the allegations of Kaniyah's abuse and successfully petitioning the state court to have Kaniyah removed from the home.  Defendant Adams is entitled to qualified immunity on Plaintiff's substantive due process claim to the extent that her actions can be considered to have been administrative in nature and not related to her role as an advocate.  Plaintiff's procedural due process claim based upon the placement of and failure to remove her name from the Michigan Central Registry fails to identify the deprivation of a constitutional right and fails to establish that Adams was the proximate cause of any alleged deprivation.  Finally, Plaintiff's gross negligence claim fails to establish that Adams conduct was in any respect demonstrative of a willful or reckless disregard for whether injury would result.

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment (Dkt. No. 21) and DENIES Plaintiff's Cross-Motion for Summary Judgment (Dkt. No. 23).

IT IS SO ORDERED.


                                        S/Paul D. Borman
                                        PAUL D. BORMAN
                                        UNITED STATES DISTRICT JUDGE

Dated:  June 8, 2012

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on June 8, 2012.


S/Denise Goodine_____
Case Manager